# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT NITCH,                               )
                                            )
      Plaintiff,                          )
                                            )
      v.                                  )     No. 16-CV-06033
                                            )
GEISHA ESTER, KALYN TRAVIS,                 )     Judge John J. Tharp, Jr.
and LYNN WILLIAMS,                          )
                                            )
      Defendants.                         )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Robert Nitch brings his Amended Complaint pursuant to 42 U.S.C. § 1981, alleging that the defendants, all of whom are Chicago Transit Authority ("CTA") employees, engaged in unlawful racial discrimination leading to his constructive discharge. The defendants have moved to dismiss the Amended Complaint in its entirety.[1] For the reasons set forth below, the Defendants' motions to dismiss are granted.

## BACKGROUND

As it must on a motion to dismiss, the Court accepts the well pled facts in Nitch's first amended complaint (the "FAC") as true and draws all permissible inferences in favor of the plaintiff. *Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012).

Plaintiff Robert Nitch began employment with CTA as a Railcar Service Apprentice on February 23, 2013. Though the complaint does not specifically detail his duties, it appears that a railcar servicer's principal duty is to clean CTA railcars. During his nine months in that position

---

[1] Defendants Ester and Williams moved jointly to dismiss the complaint. ECF No. 21. Defendant Travis, who had not yet been served when Ester and Travis filed their motion, subsequently filed her own motion. ECF No. 33.

he received positive evaluations (one 4.5/5 review and eight 5/5 reviews), and was never tardy or absent.

On December 23, 2013, Nitch began working on the "bus side" as a Bus Service Apprentice (cleaning buses) and was assigned to the Forest Glen bus garage. Shortly thereafter, Plaintiff alleges that he was called into the manager's office by James Foreman, where Mr. Foreman "remarked sarcastically that Plaintiff's bus was filthy."[2] FAC Ct. 1 ¶ 2, ECF No. 16.[3] Nitch notes that Foreman is African-American. Nitch alleges that other buses—cleaned by African-Americans—were not as clean as his and that Mr. Foreman had joked with another employee, Trina, about how she had not "even touched the floors of her bus." *Id*. Nitch alleges that he had worked on cleaning his bus until "at least 4:30 a.m. without overtime pay." FAC Ct.1 ¶ 3, ECF No. 16. (Elsewhere, however, Nitch alleges that he worked "the graveyard shift," from 8:00 p.m. until 4:30 a.m., so it is not clear why he would have been entitled to overtime pay for working until 4:30 a.m.) Additionally, on that day Nitch was the only male apprentice out of six that was present at work. Nitch alleges that the five other male apprentices, all African-American, were not subject to any disciplinary action—such as a mark on their attendance record—for their absences.

On January 8, 2014, Nitch was notified by defendant Geisha Ester, Senior Manager of the apprenticeship program, that he would be interviewed for a Bus Servicer position (*i.e.,* a non-

---

[2] The plaintiff's chronology is confused here. The complaint alleges that this incident occurred on December 20, 2013, but that would be three days before he says he started working on busses.

[3] The paragraphs in the FAC are not numbered sequentially through the complaint, but only within each count. As a result the complaint confusingly contains multiple paragraphs bearing the same numbers. In any amended complaint, the plaintiff is directed to number the paragraphs sequentially throughout the entire complaint.

apprentice position) on January 10, 2014. He was required to bring his driver's license, two letters of recommendation, and driver's abstract. Nitch alleges that he had "less than forty hours" to gather these materials and "as far as he knows," African-American candidates did not have "to contend with such a compressed time schedule." FAC Ct. 1 ¶ 4, ECF No. 16.

The night before his interview, Nitch was subjected to what he was told was a "random drug test." FAC Ct. 1 ¶ 6, ECF No. 16. Nitch alleges—again, so far as he knows—that random drug tests were not typically given to apprentices and were reserved for permanent employees, but he believed that the test was related to his upcoming interview for a permanent position. Nitch alleges that he was lied to about the random nature of the test because he saw a label that said "reasonable suspicion" on the test kit. Nitch contends that this testing was discriminatory because other apprentices, who were "well known" marijuana users, were not tested. *Id.* Nitch passed the drug test, interviewed for the position of Bus Servicer on January 10, 2014 on little sleep, and was congratulated before leaving. Nitch interpreted the congratulations to "imply that he had successfully passed the interview." FAC Ct. 1 ¶ 5, ECF No. 16.

On January 17, 2014, defendant Kalyn Travis, Manager of the Apprenticeship program, informed Nitch that he was no longer being considered for the Bus Servicer position. Travis informed him that he needed more time as an apprentice and did not receive the position because of his interview. Nitch does not credit that explanation, alleging that the interview was a formality and that, in the prior month (December 2013), twelve African-American railcar or bus apprentices who had been called for interviews had been promoted without interviews when they arrived at CTA headquarters at the appointed hour. Having been passed over for the promotion, Nitch alleges that he was the only remaining Bus Servicer apprentice who was neither "too new

to be in the hiring range" nor "had too many absences or write-ups to be hired." FAC Ct. 1 ¶ 11, ECF No. 16.

Between January 19, 2014 and January 31, 2014, CTA began calling apprentices for Railcar Servicer positions. Despite good reviews, a perfect attendance record, and no write-ups, Nitch did not receive a call. Plaintiff alleges that all the apprentices who received a call for the Railcar Servicer positions were African-American. *Id.* Indeed, he states that it is his belief that he is the "only white or Caucasian in the entire Apprenticeship Program." FAC Ct. 1 ¶ 9, ECF No. 16.

Nitch alleges that defendant Ester called him on January 29, 2014 in response to his queries about why he had not been promoted to the Bus Servicer position. Ester allegedly provided no information that had not already been relayed to Nitch during his previous conversation with Travis, noting only that the interview was the determining factor in his rejection from the Railcar and Bus Servicer positions and that his good work and perfect attendance did not matter. Nitch further alleges that Ester spent twenty minutes on the phone call unsuccessfully attempting to bait Nitch into losing his temper. Nitch alleges that Ester knew that he was the only eligible apprentice considered for the position who was not ultimately hired. Nitch sent an e-mail to Ester on January 20, 2014, to express his feelings about their phone conversation and to ask her to confirm his work ethic with his managers. FAC Ct. 2 ¶ 9, ECF No. 16. Ester did not respond.

Nitch points to "Ruth," a female African-American participant in the apprentice program as further evidence that the decision not to promote him was discriminatory. Ruth, he alleges, was one of the twelve African-American apprentices promoted from the apprenticeship program in December 2013 without having to undergo an interview. According to Nitch, defendant Ester

promoted Ruth to Railcar Servicer although she was unqualified because she had repeatedly failed the commercial driver's license test (according to the complaint, however, a CDL license is a requirement for the position of Bus Servicer, not for the Railcar Servicer position for which "Ruth" was hired). He also alleges that Ruth was promoted despite disqualifying absences from work. Nitch alleges that defendant Travis assisted Ruth by assisting in removing two absences from her record so that Ruth could get the Railcar position.

In early March 2014, the Forest Glen garage received two new managers: Lynn Williams as Manager of the graveyard shift and Mike Green as Manager II, responsible for the entire garage. Plaintiff notes that both Williams and Green are African-American and had previously worked together. Plaintiff Nitch alleges that under Williams and Green he began receiving disparate treatment, including being marked down for hidden areas not specified on the General Cleaning score sheet; being written up for use of a water hose which he had not, in fact, used; and being placed under heightened scrutiny and receiving lower scores during cleaning inspections. Plaintiff alleges that no African-American employees were subject to this treatment. *Id.*

After being wrongfully written up by Williams for the water hose incident and receiving a score of 53% on a cleaning inspection, Nitch was called to CTA headquarters by defendant Travis where he received unspecified additional discipline. As a result, Nitch alleges that his "chances of obtaining permanent employment had dropped to almost zero." FAC Ct. 1 ¶ 15, ECF No. 16. Nitch contends that the persistent harassment and discrimination he perceived left him no choice but to resign on June 20, 2014. Plaintiff alleges that he faced harassment because he was the "only white or Caucasian apprentice" and he was singled out from African-American apprentices who "made up almost the entire workforce." FAC Ct. 1 ¶ 18, ECF No. 16.

Furthermore, Nitch alleges that he was "emotionally and psychologically affected" as a result of the defendants' discriminatory conduct. *Id.*

Nitch filed suit against the CTA on June 9, 2016. The complaint, though filed by counsel, appears to be modeled on this court's form complaint for pro se employment discrimination claims; it does not specifically identify the causes of action being asserted.[4] Characterizing the complaint as one asserting claims under Title VII and § 1981, the CTA moved to dismiss the complaint, arguing that the plaintiff had failed to exhaust administrative remedies as to any Title VII claim (he did not file a complaint with the EEOC) and that the § 1981 claim was largely time-barred because a two-year statute of limitations applied to claims under § 1981, citing *Smith v. City of Chicago Heights*, 951 F.2d 834, 839 (7th Cir. 1992). The CTA further argued that only conduct occurring within two years of the filing of the complaint was actionable and that such conduct was limited to the plaintiff's allegation that he was constructively discharged from the CTA on June 20, 2014; those allegations, the CTA argued, were insufficient to state a claim.

Nitch responded by filing an amended complaint (the FAC). ECF No. 16. The FAC dropped the CTA as a defendant and added defendants Ester, Travis, and Williams instead. It stated that "this is an action for constructive discharge predicated on intentional reverse discrimination," FAC Background ¶ 1, ECF No. 16, and clarified that the reverse discrimination claim was being asserted pursuant to § 1981. FAC Background ¶ 4, ECF No. 16 ("jurisdiction over the statutory violation is conferred by 42 U.S.C. § 1981"); Background ¶ 8 (no EEOC

---

[4] The complaint includes a boilerplate paragraph from the form pro se complaint that lists a panoply of statutory sources typically asserted in employment discrimination cases, specifically Title VII (42 U.S.C. § 2000e et seq.), 42 U.S.C. §§ 1981 and 1983, the ADEA (42 U.S.C. § 12117), and the Rehabilitation Act (29 U.S.C. § 791).

charge filed, but plaintiff "is not required to do so under 42 U.S.C. § 1981"). The FAC does not refer to §1983 anywhere.

On August 29, 2016, defendants Ester and Williams moved to dismiss the FAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 21. Defendant Travis similarly moved to dismiss Nitch's amended complaint on November 16, 2016 on the same grounds as Ester and Williams. *See* ECF No. 33. So far as it is necessary to discuss them in deciding these motions, the parties' briefs relating to the two motions are substantively identical. To simplify the discussion, then, this opinion will simply refer to the first set of briefs filed, which relate to the motion of defendants Ester and Williams.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). A plaintiff does not need "detailed factual allegations," but must plead more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Determining whether a complaint plausibly states a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. Rule Civ. Proc. 8(a)(2)).

## I. Plaintiff's Amended Complaint, As Written, Is Improperly Brought Under Section 1981.

Defendants first argue that Nitch's claims are improperly brought under § 1981 and must instead be brought pursuant to § 1983. To the extent that they argue that § 1981 does not provide Nitch with a remedy for the discrimination and retaliation he alleges, they are correct: "42 U.S.C. § 1981 does not create a private right of action against state actors." *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014). The Supreme Court has differentiated § 1981 and §1983 claims, holding that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). In other words, when the statutory violation claimed by the plaintiff is a violation of a right provided by § 1981, a private party may sue the state actor for that statutory violation only under § 1983, not under § 1981; only private parties may be sued directly under § 1981.[5]

On one level, the question of whether Nitch is proceeding under § 1981 or § 1983 is of no moment. "A complaint need not identify legal theories, and specifying an incorrect theory is not

---

[5] The parties' focus on whether the defendants were sued in their official or individual capacities is misplaced. The plaintiff's § 1981 claim is impermissibly lodged against a state actor either way. Yes, claims against the defendants in their official capacities constitute claims against the CTA itself, and so are not subject to a claim by a private party under § 1981, but the defendants, as employees of a governmental entity, are also state actors (and therefore not subject to suit under § 1981) when, as here, they are acting under color of law. Thus, amending the complaint to permit repleading that the defendants were acting in their individual capacities would not change the analysis; the plaintiff's § 1981 claim would still be barred because it would still target governmental actors. *See McCormick v. Miami University*, 693 F.3d 654, 661 (6th Cir. 2012) ("The reasoning of *Jett* is equally applicable to § 1981 suits against state actors sued in their individual capacity.").

a fatal error." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). For that reason, and contrary to the CTA's view, there is no need to amend the complaint to shift the statutory basis of Nitch's claim from § 1981 to § 1983. If Nitch has a viable claim that the defendants violated rights guaranteed to him by § 1981, dismissing his complaint because he erroneously premised his right to remedy that violation on § 1981 rather than on § 1983 would serve no purpose; justice would require that he be permitted to amend to bring the claim pursuant to § 1983 instead. *See* Fed. R. Civ. P. 15(a)(2) (courts "should "freely give leave when justice so requires"). The claim asserted may therefore go forward as a § 1983 claim even if the complaint does not expressly invoke that statute. *See, e.g., Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014) (summary reversal of summary judgment based on failure to expressly invoke § 1983 in complaint).

Nevertheless, the distinction as to the proper statutory basis of Nitch's claim may matter here because the statutes of limitation applicable to § 1981 and to § 1983 may differ. Section 1981 claims by private actors are generally subject to the general four-year federal statute of limitations set forth in 28 U.S.C. § 1658. *Campbell*, 752 F.3d at 668. Section 1983 claims, however, are subject to the statute of limitations for personal injury claims applicable under the law of the state where the violation occurred. *See Wilson v. Garcia,* 471 U.S. 261 (1985); *Owens v. Okure,* 488 U.S. 235 (1989). Here, where the alleged violations occurred in Illinois, the statute of limitations applicable to claims under § 1983 is the two-year statute of limitations borrowed from Illinois personal injury law. *Campbell,* 752 F.3d at 667; *Woods v. Illinois Dep't of Children & Family Servs.*, 710 F.3d 762, 768 (7th Cir. 2013) ("we reiterate our holding that the limitations period applicable to *all* § 1983 claims brought in Illinois is two years") (emphasis in original); 735 Ill. Comp. Stat. Ann. 5/13-202. Effectively, application of § 1983's two-year limitations

period would bar any claim Nitch has based on conduct occurring more than two years before he filed the complaint in this case. Nitch filed his original complaint on June 9, 2016, so any incidents that occurred before June 9, 2014 are time barred. The only non-time barred factual allegation brought is his resignation from CTA on June 20, 2014. Thus, under § 1983, Nitch's only claim would be for constructive discharge.

Seeking to avoid this evisceration of his discrimination claim, Nitch not surprisingly maintains that the four-year statute set forth in § 1658 applies. Congress enacted § 1658 in 1990, creating a four-year statute of limitations applicable to "civil actions 'arising under an Act of Congress enacted after the date of the enactment of this section.'" *Campbell*, 752 F.3d at 667 (quoting 28 U.S.C. § 1658). In 1991, Congress amended § 1981 to permit claims—like Nitch's—alleging racial discrimination after the formation of a contract. *Id.* at 668. Because they were only cognizable after the 1991 amendment, claims raised directly under § 1981 alleging post-formation racial discrimination are subject to § 1658's four-year statute of limitations. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Campbell,* 752 F.3d at 668; *see also Riley v. Elkhart Community Schools*, 829 F.3d 886, 891 (7th Cir. 2016). But in this case the principle governing the limitations period for claims based on rights created by the 1990 amendment to § 1981 runs headlong into the principle that where § 1983 provides the right to a remedy, the applicable limitations period is borrowed from the forum state's personal-injury statute of limitations (in Illinois, two years).

The question in this case therefore becomes: What statute of limitations applies to a claim against a state actor that can only be properly asserted under § 1983, but for which the underlying rights violation is post-contract formation racial discrimination in violation of § 1981? Contrary to the defendants' position that *Campbell* resolves this question in favor of

application of the two-year statute of limitations borrowed from Illinois personal injury law, in that case the court of appeals identified this question, and acknowledged the possibility that the four-year limitations period provided by § 1658 might apply, but explicitly declined to resolve the question because the plaintiff had disavowed any reliance on § 1983:

> [E]ven if § 1983 provides the exclusive remedy, [plaintiff's] claim is still based on a violation of § 1981 that could not have occurred before the Civil Rights Act of 1991 amended that statute. Thus, one might argue that § 1658's four-year statute of limitations should apply regardless. However, [plaintiff] has disavowed any reliance on § 1983; therefore, we express no opinion on that issue . . .

*Campbell,* 752 F.3d at 668 (emphasis added). The question is presented more squarely in this case, however, and it serves no purpose to duck it.[6]

The Supreme Court has repeatedly held that a state's personal injury statute of limitations should be applied to all claims arising under § 1983. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124 (2005) ("42 U.S.C. § 1988 is a directive to select, in each State, the one most appropriate statute of limitations for *all* § 1983 claims." (internal quotation marks omitted));

---

[6] In *Campbell*, the plaintiff originally asserted claims under both § 1981 and § 1983, but subsequently amended his complaint to drop the § 1983 claims. He did not request leave to amend or otherwise proceed under § 1983 and the district court affirmatively denied leave to amend for that purpose in any event. The plaintiff did not appeal that denial. Accordingly, the question of the appropriate statute of limitations was never presented to the court of appeals. Here, by contrast, Nitch has not affirmatively disavowed reliance on § 1983. Moreover, the CTA's motion raises the issue of amending to assert a claim under § 1983 and the plaintiff's response explains sets forth the basis of the argument that the applicable statute of limitations for his claim is four years based on the 1991 amendments to the Civil Rights Act and the adoption of the four-year statute of limitations in § 1658. In reply, the defendants maintain that the statute of limitations is two years whether Nitch's claim is brought under § 1981 or § 1983. Accordingly, the Court concludes it is appropriate to address the question; punting at this juncture would accomplish nothing more than delaying consideration of the question until after Nitch files an second amended complaint asserting the claim under § 1983, as he undoubtedly would were the Court to dismiss the FAC on that basis.

*Owens v. Okure*, 488 U.S. 235, 240-41 (1989) ("[A] State's personal injury statute of limitations should be applied to all § 1983 claims."); *Woods*, 710 F.3d at 765 (*Wilson* held "that courts should apply the state limitations period governing personal injury claims to all § 1983 claims"). In *Abrams*, moreover, the Court concluded that claims brought under § 1983 are subject to the relevant state personal injury statute of limitations, even if the underlying right being enforced derives from a statute with its own limitations period. 544 U.S. at 124 ("[Respondent] argues that the rule . . . that § 1983 claims are governed by the state-law statute of limitations for personal-injury torts, does not apply to § 1983 actions to enforce statutes that themselves contain a statute of limitations. . . . This contention cannot be reconciled with our [precedent], which expressly rejected the proposition that the limitations period for a § 1983 claim depends on the nature of the underlying right being asserted.").

This language seemingly forecloses the notion that § 1658's four-year statute of limitations applies to Nitch's claims. Because Nitch's claims are only properly raised under § 1983, and all § 1983 claims—regardless of what underlying substantive right is being enforced and regardless of whether the statute providing that right supplies a limitations period—are subject to the relevant state's personal injury statute of limitations, Nitch's would seem to be subject to Illinois' two-year limit. Yet in *Abrams*, the Supreme Court also stated, albeit in dicta, that § 1658's four-year statute of limitations "would seem to apply" to a § 1983 claim enforcing substantive rights that were created after enactment of the general four-year statute of limitations in § 1658. *See Abrams*, 544 U.S. at 124 n.5. And indeed, it appears that the Court found no tension between its statements that the nature of the right asserted has no bearing on the statute of limitations applicable to a claim asserting the right and its statement that the date the right was created seemingly would, because the Court considered the substantive argument advanced by

the petitioner city under both assumptions—that the borrowed state statute of limitations applied and that § 1658 applied. *See* 544 U.S. at 124-125.

Although the Court did not tackle the question in *Abrams*, and the Seventh Circuit similarly demurred in *Campbell,* both seem to be pointing down the trail blazed by *Donnelley*. The entire premise underlying the "borrowing" of state law personal injury statutes of limitation is that there was not a federal statute applicable to the claim. *See Wilson,* 471 U.S. at 266-69. But the enactment of § 1658 invalidated that premise. State law fills gaps in federal civil rights statutes only so far as it is not inconsistent with federal law. *Id.* at 269; 42 U.S.C. § 1988. But with the enactment of § 1658, there is no limitations period gap to fill with state law, and applying shorter state law limitations periods than the four-year period now provided in § 1658 is seemingly "inconsistent with" the federal limitations period. And while the *Donnelley* Court concluded that "settled expectations provide a valid reason to reject an interpretation of § 1658 under which any new amendment to federal law would suffice to trigger the 4-year statute of limitations," 541 U.S. at 381-82, such concerns do not apply in the context of claims newly created after the enactment of § 1658. As to those claims, whether brought under § 1981 or § 1983, there is an available federal statute of limitations. The defendants have advanced no rationale for continuing to apply state personal injury limitations periods to claims asserted against state actors that would, if asserted against private actors, be subject to the federal four-year statute and none suggests itself to the Court.

Still, all this is surmise and prediction, akin to reading tea leaves. Despite acknowledging the likely answer to this question, as yet neither the Supreme Court nor the Seventh Circuit has held that § 1658 applies to a claim brought under § 1983 which asserts a violation of post-

contract formation conduct prohibited by the 1991 amendment to § 1981.[7] This Court cannot

base its ruling on a prediction that the Supreme Court or the Seventh Circuit will overturn their

existing precedents. *Saban v. U.S. Dep't of Labor*, 509 F.3d 376, 378 (7th Cir. 2007) ("The

Supreme Court has told the lower courts that they are not to anticipate the overruling of a

Supreme Court decision, but are to consider themselves bound by it until and unless *the Court*

overrules it, however out of step with current trends in the relevant case law the case may be.")

(emphasis in original). Notwithstanding the hints in *Abrams* and *Campbell,* what remains the law

is that "all" § 1983 claims in Illinois are subject to a two-year statute of limitations. *Wilson,* 471

U.S. at 275-76; *Woods,* 710 F.3d at 766 ("this court has consistently held that the limitations

period applicable to § 1983 actions brought in Illinois is the two-year period for general personal

injury actions set forth in 735 ILCS 5/13–202"). Until the Supreme Court or the Seventh Circuit

determines that § 1658 applies to § 1983 claims asserting violations of § 1981 by state actors,

this court must follow the established rule that § 1983 borrows state personal injury statutes of

limitations. The limitations period applicable to Nitch's claim is therefore two years.

　　The overwhelming majority of the facts alleged in the complaint took place over two

years before Nitch filed his complaint. Indeed, the only act Nitch has alleged that falls within the

applicable two-year statute of limitations is his decision to resign on June 20, 2014, which Nitch

asserts constituted a constructive discharge. Because the FAC asserts Nitch's claims directly

---

[7] Despite the *Abrams* dicta, and an intervening decade, few courts appear to have taken up the question of whether § 1658 applies to § 1983 claims against state actors alleging violations of rights provided by § 1981. Based on this court's review (the parties' briefs do not stray outside this circuit), there appears to be a circuit split on the question. *Compare Garrett v. Thaler*, 560 F. App'x 375, 383–84 (5th Cir. 2014) (§ 1658 does not apply because *§ 1983* has not been expanded by post-1991 amendment) *with Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337–38 (11th Cir. 2008) (holding § 1983 limitations period is determined under § 1658 for action based upon post-1990 amendments to § 1981).

under § 1981 instead of § 1983 and therefore relies heavily on facts outside of the applicable two-year limitations period, the court will dismiss Nitch's complaint without prejudice to give him the opportunity to replead his constructive discharge claim before evaluating it in the context of § 1983 and the applicable two-year limitations period.

*       *       *

The defendants' motions to dismiss are granted without prejudice. To properly bring his claims against the defendants in their individual capacities pursuant to § 1983 and to the extent that Nitch can plead further facts with regards to his constructive discharge claim he is granted leave to amend within 30 days.

Dated: October 17, 2017

John J. Tharp, Jr.
United States District Judge