# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT NITCH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 16 CV 06033 |
| GEISHA ESTER, KALYN TRAVIS, and LYNN WILLIAMS, | ) Judge John J. Tharp, Jr. ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Nitch, a white man, was an apprentice at the Chicago Transit Authority until June 2014. Nitch alleges that his superiors denied him promotions and otherwise discriminated against him because of his race. He has filed suit against three of those superiors, who now move to dismiss his Second Amended Complaint.

## BACKGROUND[1]

Robert Nitch started as a Railcar Service Apprentice at the Chicago Transit Authority in February 2013. Second Amended Complaint ("SAC"), Ct. 1 ¶ 1, ECF No. 50. In December 2013, Nitch was transferred to be a CTA Bus Service Apprentice. *Id*. Ct. 1 ¶ 2. Nitch was the only white apprentice at his bus garage; every other apprentice was black, as were each of Nitch's supervisors. *Id*. Ct. 1 ¶ 3. Soon after his transfer, Nitch was subjected to unwarranted criticism from his supervisor, James Foreman, who remarked that a bus Nitch had adequately cleaned was "filthy." *Id*. Foreman did not reprimand, and in fact joked with, a black employee

---

[1] As this is a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012).

who admitted that she had not cleaned the floors of her bus. *Id*. Ct. 1 ¶ 2. Nor were the other apprentices reprimanded when five of them failed to show up for a shift. *Id*. Ct. 1 ¶ 3.

In January 2014, defendant Geisha Ester called Nitch and informed him that he had sufficient seniority for a position as a Bus Servicer with the CTA. *Id*. Ct. 1 ¶ 4. Ester told Nitch that he was scheduled for an interview two days later, and was required to bring two letters of recommendation and his driver's abstract. *Id*. This gave Nitch less than 40 hours to cobble together the requisite materials, a difficulty encountered by no black apprentice who was scheduled for a promotion interview. *Id*. Nonetheless, Nitch did well in the interview and was told "congratulations" on his way out. *Id*. Ct. 1 ¶ 5.

That night, Nitch was given what he was told was a "random" drug test. *Id*. Ct. 1 ¶ 6. But the label for the testing kit was labeled "reasonable suspicion," suggesting the test was not so random. *Id*. No other apprentice was tested, even though it was common knowledge that some of them smoked marijuana. *Id*. Nitch passed the drug test. *Id*.

A week after the interview and drug test, defendant Kalyn Travis, manager of the apprenticeship program, called Nitch and informed him that he was no longer being considered for the Bus Servicer position. *Id*. Ct. 1 ¶ 7. Travis told Nitch only that the interview was the reason he did not receive the promotion. *Id*. Typically the only factor that would disqualify them from a promotion once they had the requisite seniority was if they had "write-ups" for violating CTA rules or poor work performance. *Id*. Nitch had never been written up. *Id*. It seemed odd to Nitch that Travis cited the interview as the reason he did not receive the position as a month earlier, twelve black apprentices with the requisite seniority were given promotions automatically, without an interview. *Id*. One of those apprentices, a woman named Ruth, had

been assisted by Travis and Ester in getting absences removed from her record so she would be eligible for promotion. *Id*. Ct. 2 ¶ 8, Ct. 3 ¶ 4.

Later in January, the CTA began promoting apprentices to Railcar Servicer positions. While black apprentices at Nitch's bus garage, some of whom had lower seniority than Nitch, received promotions, Nitch was never called. *Id*. Ct. 1 ¶ 8. Nitch had received nearly perfect reviews during his time as a railcar service apprentice. *Id*. After this round of hiring, aside from Nitch, the only apprentices left at Nitch's bus garage were those who lacked the requisite seniority and those who had too many write-ups or absences to be hired permanently. *Id*. Ct. 1 ¶ 11. Nitch fell into neither category. *Id*. When Nitch further inquired to Travis as to why he was not promoted, Ester called him and reiterated that he had not been hired because of his interview. *Id*. Ct. 2 ¶¶ 2-3. Ester stayed on the phone with Nitch for 20 minutes, attempting to bait him into losing his temper. *Id*. Ct. 2 ¶ 5. Nitch nonetheless remained calm and followed up with an e-mail to Ester expressing concern that he was a victim of discrimination. *Id*. Ct. 2 ¶ 9. Ester never responded. *Id*.

In March 2014, Lynn Williams became Nitch's manager at the bus garage. *Id*. Ct. 1 ¶ 12. Williams soon started treating Nitch differently than the black apprentices. *Id*. Ct. 1 ¶ 13. Williams was responsible for evaluating the cleanliness of the buses apprentices were assigned to clean, and she did so according to a score sheet listing specific areas to be assessed. *Id*. When evaluating buses, Williams marked down Nitch—but not any of the black apprentices—for failing to clean hidden areas not enumerated on the score sheet. *Id*. The result was that Nitch was regularly given low scores for buses that were sufficiently cleaned. *Id*. Ct. 1 ¶ 14. In one instance, in April 2014, Williams scored Nitch's bus at 53%, and gave Nitch a disciplinary write-up. *Id*. Ct. 4 ¶ 4. Black apprentices whose buses scored poorly were given only warnings. *Id*.

3

Moreover, while Williams inspected and evaluated the buses of black apprentices only a couple times a month, she evaluated Nitch's buses almost every day. *Id*. Ct. 1 ¶ 18.

Williams also singled out Nitch in other ways. Williams wrote up Nitch when she saw an apparently prohibited hose near his bus and assumed that Nitch had used it. *Id*. Ct. 1 ¶ 15. Williams did not write up black apprentices who had actually used the hose. *Id*. This second write up—which resulted in a May 2014 disciplinary meeting with Travis—made it virtually impossible for Nitch to be given a permanent position. *Id*. On June 13 and 17, 2014, Williams denied Nitch permission to clean the bus he had selected after arriving early, which she never did to black apprentices. *Id*. Ct. 1 ¶ 19. And from June 14 to June 19, 2014, Williams made it difficult for Nitch to obtain cleaning supplies, making it harder for him to clean his buses. *Id*. Ct. 1 ¶ 20. On June 20, Nitch quit the CTA, believing he was being discriminated against on account of his race.

Nitch subsequently filed suit under 42 U.S.C. § 1983, alleging that Ester, Travis, and Williams discriminated against him because of his race. Nitch has amended his complaint twice, the first time in lieu of responding to the defendants' initial motion to dismiss and the second in response to this Court's ruling on the defendants' subsequent motion to dismiss. Op. on Mot. to Dismiss, ECF No. 46 ("*Nitch I*"). The defendants now move to dismiss Nitch's Second Amended Complaint ("SAC").

## DISCUSSION

### I. Statute of Limitations

In *Nitch I,* the Court concluded that the two-year statute of limitations applicable to causes of action brought under 42 U.S.C. § 1983 applied to Nitch's reverse discrimination claim. See *Nitch I* at 8-14. Nitch filed his initial complaint in this case on June 9, 2016. See ECF No. 1.

Because his Amended Complaint contained few factual allegations concerning events that occurred after June 9, 2014, the Court gave Nitch the opportunity to replead. The Second Amended Complaint recites several allegedly discriminatory acts taken by defendant Williams after June 9, 2014. It fails, however, to allege a single act taken by either Ester or Travis on or after that date.

"Any discrete acts that [the plaintiff] alleges occurred outside of the limitations period for § 1983 actions are barred, but acts that contribute to a hostile work environment may be considered so long as one of the contributing acts occurred within the limitations period." *Hildebrandt v. Illinois Dep't. of Nat. Resources*, 347 F.3d 1014, 1036 n. 18 (7th Cir. 2003). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination . . . constitutes a separate actionable unlawful employment action." *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Id*. "The entire hostile work environment encompasses a single unlawful employment practice." *Id*. at 117.

Nitch's claims against Ester and Travis are based on discrete acts of alleged discrimination that fell outside of the limitations period: the failure to promote Nitch to a Bus Servicer or Railcar Servicer position in January 2014. None of the allegations against Ester concern anything other than the failure to promote Nitch and the decision to promote other, seemingly less qualified black candidates. The complaint contains a single allegation against Travis not relating to the promotions, asserting that she conducted a disciplinary meeting with Nitch in May 2014 after he was written up by Williams. This event also occurred outside the limitations period. Individual liability under Section 1983 must be premised upon "personal

5

involvement in the alleged constitutional deprivation," *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2008), and Nitch has failed to allege either a discrete act of discrimination undertaken by Ester or Travis within the limitations period, or conduct by Ester or Travis in the limitations period that contributed to a hostile work environment. Nitch's claims against Ester and Travis are therefore barred by the statute of limitations.

Nitch's claim against Williams is qualitatively different. Nitch does not allege that Williams failed to promote him, or made any other singular choice that affected his terms of employment. He instead maintains that Williams engaged in a systematic course of harassment and identifies several specific acts—including falsely giving his buses low scores and denying him access to cleaning supplies—that occurred after June 9, 2014. The essence of Nitch's claim is that Williams engaged in a course of conduct that is actionable, even if no individual decision she made gave rise to a cause of action by itself. *See Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). Because Williams's allegedly harassing behavior continued into the limitations period, the Court is permitted to assess Williams's entire course of conduct in determining whether the complaint states a claim against her.[2] *See Hildebrandt*, 347 F.3d at 1036 n.18.

---

[2] Defendants argue that because Nitch was aware that several discriminatory acts had been taken against him prior to the limitations period, all of his claims are time barred because the acts did not "blossom[] into a wrongful injury" during the limitations period. *See* Def's Reply Br. at 4, ECF No. 63. But that is not right. Say, for example, an employee is harassed because of his race by an employer and it becomes actionable on January 1, 2018. According to defendants, if the employee does not sue by January 1, 2020, he can *never* sue his employer, despite the fact that the harassment continued past that date. That would leave the employer free to continue harassing the employee for decades to come, a result at odds both with common sense and with the Supreme Court's holding that the entirety of a hostile work environment constitutes "a single unlawful employment practice." *Morgan*, 536 U.S. at 117. Nitch may pursue a hostile work environment claim based on Williams's conduct "so long as it formed a single unlawful employment practice that reached into the statutory period." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017); *see also Morgan*, 536 U.S. at 117 (holding that an act within the

## II. Section 1983

### A. Deprivation of Rights and Qualified Immunity

To state a § 1983 claim, a plaintiff must allege that a defendant deprived him of a federal right while acting under the color of state law. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). The doctrine of qualified immunity protects government officials from § 1983 liability "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Chasensky v. Walker*, 740 F3d 1088, 1094 (7th Cir. 2014). "To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right . . . and existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (alterations omitted).

Defendants argue that the complaint fails to state a § 1983 claim, and alternatively that they are entitled to qualified immunity, because the Second Amended Complaint fails to identify a specific statutory or constitutional right on which Nitch's claims are premised. Instead, defendants assert, the complaint alleges "only reverse discrimination against Plaintiff on the basis of his race." Mot. to Dismiss 7, ECF No. 54. Plaintiffs are not required to plead legal theories. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 847 F.3d 852, 860 (7th Cir. 2017). A plaintiff need not even identify § 1983 as the basis of his complaint, let alone identify the underlying right he seeks to vindicate. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346-47 (2014) (summarily reversing a Fifth Circuit decision requiring plaintiffs seeking damages for

---

limitations period "need not . . . be the last act. . . . Subsequent events . . . may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole"); *Hildebrandt*, 347 F.3d at 1036 n.18 (applying *Morgan* in the § 1983 context).

violations of constitutional rights to invoke § 1983 in their complaint). A complaint must only adequately inform the defendant of the factual basis for the plaintiff's claims. *Id*. So the fact that the Second Amended Complaint does not specify the particular statutory or constitutional rights allegedly violated neither dooms Nitch's § 1983 claim nor demonstrates that defendants are entitled to qualified immunity.

In any event, the Court is at a loss to understand this argument, particularly in light of the discussion of the plaintiff's claim in *Nitch I.* Plausible allegations of reverse discrimination by public officials against employees on the basis of their race can give rise to a number of statutory and constitutional causes of action—including, as discussed in the Court's prior opinion, a cause of action for violating 42 U.S.C. § 1981: "Congress amended § 1981 to permit claims—like Nitch's—alleging racial discrimination after the formation of a contract." *Nitch I* at 10 (citing *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.,* 752 F.3d 665, 671 (7th Cir. 2014)). And, as the Court also observed in its first opinion, this is a case in which the "claim against a state actor can only be properly asserted under § 1983, ***but for which the underlying rights violation is post-contract formation racial discrimination in violation of § 1981***." *Nitch I* at 10 (emphasis added); *see also Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 467 (7th Cir. 2014) ("the prohibitions in 42 U.S.C. § 1981 are enforced against state actors by suits under section 1983, because section 1981 does not provide remedies against state actors for violation of its prohibitions"). The defendants do not challenge the point; they merely complain that in the SAC, Nitch has not specifically reiterated that his § 1983 claim is premised on the defendants' violation of § 1981. Nitch was not required to do so, and in any event that is at least one viable

8

premise for his claim,[3] so the defendants' qualified immunity challenge—based solely on this misconceived pleading quibble—therefore fails.

### B. Color of Law

Williams next argues that the complaint fails to state a § 1983 claim because it does not allege that she acted under the color of state law. "Not every action by a state official or employee is to be deemed as occurring under color of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010). "[R]ather, action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possibly only because the wrongdoer is clothed with the authority of state law." *Id.* (internal quotation marks omitted). "A state officer's conduct does not constitute acting under color of state law unless it is related in some way to the performance of the duties of the state office." *Id.* (internal quotation marks omitted).

Williams does not seem to dispute that she is an employee of a government agency. And the facts alleged in the complaint bely any argument that Williams was acting outside of her capacity as a state employee when she allegedly harassed Nitch. Each of the actions alleged occurred in her capacity as Nitch's supervisor at the CTA: she unfairly gave him poor performance reviews, wrote him up for fictitious wrongdoing, and denied him access to the cleaning supplies necessary to do his job. Each of these actions was only possible because Williams was Nitch's supervisor at a government agency. It is difficult to envision a more

---

[3] Nitch would presumably also have an Equal Protection claim under the Fourteenth Amendment. "Race-conscious employment decisions made by the state are presumptively unconstitutional and will satisfy the requirements of equal protection only where they are consistent with strict scrutiny." *Alexander v. City of Milwaukee*, 474 F.3d 437, 444 (7th Cir.2007).

straightforward case of an employee acting under color of state law. *See Valentine v. City of Chicago*, 452 F.3d 670, 682-83 (7th Cir. 2006).[4]

C. **Constructive Discharge**

Nitch characterizes the discrimination he experienced as being constructively discharged on account of his race. Williams contends that the SAC fails to plausibly allege constructive discharge. The Seventh Circuit generally evaluates employment discrimination claims brought via § 1983 (and § 1981) under the same standards it reviews claims under Title VII of the Civil Rights Act of 1964. *McPhaul v. Board of Commissioners of Madison Cty.*, 226 F.3d 558, 566 n. 6 (7th Cir. 2000) (Section 1983 claims); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act."). Constructive discharge occurs "when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). This is an exacting standard that requires "a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim." *Id.*[5]

---

[4] Williams argues on reply that Nitch waived the argument that she was acting under color of law because his response to the motion to dismiss only addresses whether the CTA is a state agency (a fact that is unchallenged). But any inadequacy in Nitch's response was brought on by the lack of clarity in defendants' opening brief, which provides no explanation as to how the SAC failed to allege that Williams's actions were unrelated to her position as a manager at the CTA. *See* Mot. to Dismiss 9.

[5] While constructive discharge and hostile work environment are not identical theories, they bear a key similarity: they both may be based on a series of actions, no one of which necessarily creates a viable claim, but which together permit relief. The Court therefore treats Nitch's constructive discharge theory—which is not based on one act, but on repeated conduct—like a hostile work environment theory for statute of limitations purposes. As such, the Court will consider each of Williams's actions in assessing whether the complaint properly alleges constructive discharge. *See Jackson v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 54 F. App'x

Williams's conduct, as pled in the Second Amended Complaint, gives rise to a plausible constructive discharge cause of action. In *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000), the Seventh Circuit considered whether three white police officers who were repeatedly told that they were not wanted by black city officials on account of their race were constructively discharged. The Court noted that "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt*, 219 F.3d at 655. Williams's actions would have communicated that precise message to Nitch: the complaint alleges that Williams scrutinized his work daily, invariably gave his buses poor reviews when they were always properly cleaned, defeated his chances for advancement by writing him up for fictitious misconduct, and made it difficult for him to obtain the cleaning supplies necessary to do his job. The complaint further alleges that she did none of these things to black apprentices. Nitch reasonably could have interpreted Williams's conduct as communicating to him that he was not wanted and had no future at the CTA on account of his race. In another case, the Seventh Circuit reversed a district court decision dismissing a constructive discharge count on the pleadings where the female plaintiff alleged that she was subjected to "regular belittlement, unfair criticism, and unduly poor assessments" in retaliation for an earlier sex discrimination lawsuit. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014); *see also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007) (holding that the district court erred in

---

404, at *5 n. 4 (5th Cir. 2002); *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 17-18, 28-29 (1st Cir. 2002); *Coyle v. Geisinger Health Sys.*, No. Civ.A. 3:02-CV-0602, 2005 WL 2030871, at *1 n.2 (M.D. Pa. Aug. 8, 2005); *Velikonja v. Gonzales*, No. 04–1001, 2005 WL 6164807, at *4 (D.D.C. June 30, 2005).

11

granting summary judgment for employer on a constructive discharge count where plaintiff endured a "repeated pattern of offensive conduct by her supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints"). Nitch's allegations are materially indistinguishable from those deemed sufficient in *Carlson*. Nitch has therefore adequately stated a constructive discharge theory as to Williams.[6]

\*   \*   \*

For the foregoing reasons, defendants' motion to dismiss is granted with prejudice as to defendants Ester and Travis and denied as to defendant Williams.

Dated: September 19, 2018

John J. Tharp, Jr.
United States District Judge

---

[6] The defendants also ask the Court to strike Nitch's response brief, which was filed a day late. The Court does not condone late filings and admonishes the plaintiff's counsel for failing to timely file the brief. But the Court, in its discretion, declines to strike the response brief in the absence of any showing of prejudice by the defendants.